**Thomas R. SHERWOOD, Plaintiff,**

v.

**The WASHINGTON POST, Defendant.**

**Civ. A. No. 86–2701 (NHJ).**

United States District Court,
District of Columbia.

Dec. 28, 1994.

John G. Kester, Diana L. Schacht, Thomas G. Hentoff, Williams & Connolly, Washington, DC, for Washington Post.

Robert Edward Paul, Zwerdling, Paul, Leibig, Kahn, Thompson & Driesen, PC, Washington, DC, for Thomas Sherwood.

Lewis Diuguid, Martha Hamilton, Martha Levy and Claudia Saenz.

### MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Thomas R. Sherwood, a former employee of the *Washington Post*, contends that the *Post* violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207 (1988), by refusing to pay him an overtime rate for all hours worked in excess of forty hours a week for the period October 1, 1983, through November 1, 1989. At a full trial on the merits of this case, the Court received and evaluated the testimony of witnesses, assessed their credibility, reviewed the exhibits admitted into evidence, and heard the argument of counsel. The trial was bifurcated, and only the question of liability was at issue. After careful consideration of all of the evidence of record, the Court concludes that the *Post* is not liable to Sherwood for overtime pay because Sherwood's primary duty as a reporter consisted of the performance of work requiring invention, imagination, and talent. His work was therefore exempt from the overtime provisions of the FLSA.

The Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. The *Washington Post* employed Sherwood as a reporter during the relevant period of October 1, 1983, to November 1, 1989. Sherwood originally came to the *Post* in 1974, after having worked as a reporter and editor at the *Atlanta Constitution* for almost ten years, and after having worked as press secretary for a member of Congress for nine months. Def.'s Ex. 21 at 1–3; Trial Tr. at 35–36.

2. During his time at the *Post*, Sherwood worked as a reporter in Washington, D.C., and in Virginia. From October 1983 to March 1986 Sherwood was the bureau chief for the *Washington Post* in Richmond, Virginia. From March 1986 through July 1986 he held a position known as "Virginia Rover" on the Virginia staff. From July 1986 to October 1989 he was a reporter on the City Desk staff covering the District of Columbia government and Mayor Marion Barry. From October 8, 1988, to November 10, 1988, he was temporarily assigned to the National Desk to cover the candidates for the office of Vice President of the United States. Def.'s Ex. 21 at 1–2; Trial Tr. at 36–37.

3. Sherwood was a salaried employee at the *Post*. His annual salary ranged from $44,954 in 1983 to $67,967 in 1989; thus Sherwood earned more than $250 per week throughout his tenure at the *Post*. Def.'s Ex. 21 at 2.

4. Sherwood frequently worked more than forty hours per week but never received overtime pay. Def.'s Ex. 21 at 3; Trial Tr. at 39, 43. Although he did prepare weekly time sheets, *id.* at 741, he was never paid overtime because his salary was higher than the cutoff point in the collective bargaining agreement. *Id.* at 203. Sherwood received regular raises during his employment at the *Post.* He did not, however, receive any "fast track" increases until very near the end of his time there. Trial Tr. at 746.

5. The Court finds that working as a reporter at the *Washington Post* is a prestigious, competitive job among journalists. Sherwood wrote that working at the *Post* allowed him to have "opportunities that most journalists only dream of having." Def.'s Ex. 2–S–82.

6. The *Post* aims to publish fair, accurate, and balanced news stories. Every issue of the *Post* is the result of a taut, disciplined, cooperative effort which nevertheless remains sensitive to developing events. Def.'s Ex. 21 at 10.

7. Sherwood's primary duty as a reporter at the *Washington Post* was to gather news and present it to readers in a clear, fair, balanced, and expert fashion. Trial Tr. at 175.

8. Sherwood testified that his primary duty was "to gather facts that would be the basis for the news stories that appeared in the *Post.*" Trial Tr. at 48; *see also id.* at 800, 803. The Court finds that Sherwood's job did require him to gather facts, but that fact gathering was only one aspect of his duty as a reporter. Sherwood's job also required him to originate story ideas, piece together seemingly unrelated facts, analyze facts and circumstances, and present his news stories in an engaging style. The Court further finds that Sherwood's fact gathering involved more than passively writing down what others told him. He was required to cultivate sources, utilize his imagination and other skills in seeking information, and continually develop his finely tuned interviewing skills.

9. Sherwood admits that the job duties of reporters at the *Post* include the following:

"in frequent consultation with editors, reporters ordinarily originate ideas for stories based on news events, decide what facts need to be gathered, discover sources of information, decide what information to include and exclude, choose interesting and accurate language, decide on context to add, and organize facts in coherent and logical form." Def.'s Ex. 18 at 41.

10. Sherwood also admits that "[a]dequate performance of their primary duties by reporters at The Washington Post requires talent." Def.'s Ex. 18 at 27.

11. During his years at the *Post,* Sherwood acquired knowledge and expertise with respect to politics in Virginia and in the District of Columbia. Def.'s Ex. 21 at 5–6. The evidence of record clearly demonstrates that Sherwood was diligent in his pursuit of news, *id.* at 286, and was highly regarded by both his peers and his superiors during his tenure at the *Post.* *Id.* at 286, 461, 512, 548–49.

12. The evidence establishes that, in performing his duties, Sherwood was required to and did advise editors when he believed that particular topics might be newsworthy. Def.'s Ex. 21 at 7. He was expected to originate ideas for stories and did so. Def.'s Ex. 20 at 1. He decided what facts should be gathered for stories, sometimes in consultation with editors and sometimes alone. *Id.*

13. Sherwood testified that the *Post* expected him to suggest frequent story ideas based upon his observations in the area to which he was assigned, such as the District Building, Mayor Marion Barry, or the Virginia government. Trial Tr. at 52. The evidence shows that he was also charged with keeping his eye out for possible story ideas about subjects unrelated to his current assignment. For example, in early 1988, while vacationing in Daytona Beach, Florida, he found himself in the midst of a convention of motorcycle enthusiasts and filed a story which eventually bore the headline, "In Daytona, Vroom, Vroom Means Boom, Boom." *Id.* at 777–79; *see* Def.'s Ex. 53.

14. Eric Pianin, an Assistant City Editor when Sherwood was covering the Barry Administration, testified that reporters, not edi-

tors, bear the primary responsibility for coming up with story ideas at the *Washington Post.* Although editors will produce story ideas from time to time, it is the reporters who really carry this burden. Trial Tr. at 318.

15. William McAllister, who was the assignment editor in charge of the *Post*'s Virginia Desk when Sherwood was Richmond Bureau Chief, testified that Sherwood himself came up with most of the ideas for the stories he wrote in Richmond. *Id.* at 496. Sherwood often originated story ideas for other reporters as well. Trial Tr. at 512.

16. McAllister testified that during the Virginia legislative sessions, three or four reporters usually travelled to Richmond to help cover the legislature. Trial Tr. at 465–66. These reporters decided among themselves which stories they were going to cover on any given day. *Id.* at 466. Sherwood testified that the Virginia editor approved these decisions and assigned some stories as well. *Id.* at 754.

17. The Court finds that Sherwood's job duty of originating story ideas required invention and imagination. For example, McAllister testified that, in 1985, Sherwood wrote a story about Buzz Emick, a Virginia state senator. Sherwood had "spotted Emick playing a major role" in the legislature; he "quickly recognized" Emick's importance and rapidly wrote a story on this "very colorful and controversial character." Trial Tr. at 506–07; *see* Def.'s Ex. 36.

18. McAllister testified that another example of Sherwood's inventiveness was Sherwood's decision to write a story about Virginia Governor Robb's appointment of a woman to serve on the State Corporation Commission. Sherwood treated the story as an opportunity not only to write about the Commission but to show "how Robb had brought more people into the political process and into the state government." McAllister called the story "an excellent mirror not only on this powerful institution but on the style of the Robb administration." Trial Tr. at 508; *see* Def.'s Ex. 37.

19. Throughout his testimony, Sherwood stated that particular stories had been "as-signed" to him by his editors. *See, e.g.,* Trial Tr. at 762, 766, 777. The evidence discloses, however, that the editors did not necessarily originate the story ideas. Rather, the "assignment" of a story was merely an editor's way of placing a reporter in charge of a story. According to his own testimony, Sherwood was often "assigned" to stories that he himself had suggested. *Id.* at 791.

20. Sherwood testified that in order to break news consistently, he needed a good network of sources. Pianin testified that Sherwood cultivated and maintained his sources by building up trust with them and not disclosing their identities if they wished to remain unnamed. Trial Tr. at 328, 332–33. McAllister testified that Sherwood himself usually decided which sources to consult. *Id.* at 476. Pianin testified, "[Sherwood] was considered to be one of the best source reporters in the newsroom when it came to covering D.C. politics, and he spent many years at it, and over time he developed a lot of good sources." *Id.* at 332–33. This cultivation of sources demonstrates a talent not found in the typical leg man of the 1940s.

21. Pianin testified that reporters at the *Post* bear the responsibility of deciding how to go about reporting. Editors do not give reporters detailed instructions to speak to certain people but instead assume that reporters know how to obtain information. Trial Tr. at 374.

22. Milton Coleman, a former reporter on the *Post*'s District Building beat, testified that as a political reporter, Sherwood had to take disconnected bits of information—such as one person's comment, another person's actions, and a third person's gossip—and piece them together to form a coherent story. Such a story would be one "on which the desk place[d] a premium," because it was unlikely to be carried by other news organizations. Trial Tr. at 400–02. Sherwood's job thus involved "putting together pieces of a puzzle." Fitting the pieces together in order to create a story required intelligence and creativity. Moreover, Sherwood had to be inventive enough to know who to consult in order to get the pieces of the story in the first place, and how to consult his sources in such a way that other reporters would not

get the story. *Id.* at 404. As Coleman testified, "Those are all the things you do. That is part of the skill and the wherewithal that you have as a political reporter." *Id.* at 404.

23. According to the testimony of Robert Kaiser, the *Post*'s Managing Editor, Sherwood was very inventive. Kaiser testified that Sherwood would see stories that other reporters would not see in some situations. As a result, he was famous for his scoops both while he was working in Richmond and while he was working at the District Building. *Id.* at 659. For example, McAllister testified that Sherwood covered the 1984–85 Virginia gubernatorial campaign of Wyatt Durrette so effectively that Durrette's staff was "shell-shocked" and "did an electronic sweep of their office trying to find out if he had somehow bugged them." *Id.* at 513–14. The Court finds that Sherwood had to be imaginative, inventive, and talented to get information and to shape developing stories. Sherwood's job required that he obtain results through skill, not simply the reporting of facts.

24. McAllister testified that when Sherwood worked in Richmond, the city's "Old South" politics were difficult for *Washington Post* readers to understand. Sherwood's task was to act as a "translator" and make the political events in Richmond meaningful to persons living in and around Washington. To do this Sherwood had to "spot trends" and put them "in context." Trial Tr. at 500, 505. The Court finds that Sherwood needed talent and invention to report and write successfully about Richmond politics.

25. In order to be successful at his job, Sherwood had to develop sophisticated interviewing skills. For example, McAllister testified that, in 1985, Sherwood interviewed Mills Godwin, a former Governor of Virginia. Sherwood used his interviewing skills to put Godwin at ease and convince him to talk about his role in Virginia politics. McAllister considered this to be a difficult interview, but Sherwood did an excellent job; "It was a very helpful interview, very insightful." Trial Tr. at 521; *see* Def.'s Ex. 42.

26. According to the testimony of Pianin and of Leonard Downie Jr., the *Post*'s Executive Editor, Sherwood faced stiff competition from other news organizations while covering the District Building and Mayor Barry. At the time of the investigations of Mayor Barry, when the *Post*'s readers reviewed Sherwood's stories with great interest, Sherwood's job required enormous energy and patience to keep up with the controversies surrounding the mayor. Yet despite the pressure, Sherwood managed to be a "master" at convincing sources to confide in him. Trial Tr. at 227–28, 326, 339. The Court finds that Sherwood could only have accomplished this success through the use of sophisticated reporting skills and talent.

27. Coleman testified that Sherwood had to be particularly inventive when he was assigned to cover the vice presidential campaign. Because fifty other reporters were in the "pool" travelling on the plane, the *Post* expected Sherwood to do more than report the candidate's remarks each day. The *Post* expected Sherwood "to make sure that the *Washington Post*'s version of that story is a better story" than the stories in the other papers. His stories had to contain more analysis, more explanation, and more description of the intimate thoughts of the candidate and his staff. Trial Tr. at 417–18. The Court finds that Sherwood's work on the 1988 vice presidential campaign required invention and imagination.

28. Several *Post* employees testified about the organizational structure of the *Post*. The newsroom of the *Washington Post* is composed of various desks or sections, including the National and Metro desks. The Executive and Managing Editors control the overall supervision of the news operations. An Assistant Managing Editor supervises each desk; the Assistant Managing Editor is assisted by subordinate levels of editors and reporters. Trial Tr. at 49–50, 161.

29. Downie testified that in the hierarchy of the newsroom, there is no difference between reporters and editors. Trial Tr. at 164. Coleman testified that the *Post* is "considered by many a writer's newspaper, a reporter's newspaper." Trial Tr. at 397.

30. McAllister, who at one time was Sherwood's editor, testified that he relied on re-

porters to decide how to pursue their stories. As long as a reporter could justify a certain approach to writing a particular story, McAllister would let the reporter do what he wanted unless McAllister had "a strong objection" for some reason. Trial Tr. at 473–74.

31. Sherwood often operated independently, even though he was in constant contact with his editors. Sherwood's job in Richmond, for example, required that he be a "self-starter" and demonstrate "independence." Sherwood did not require much attention from his editor. Trial Tr. at 467, 479, 755. Sherwood had sole responsibility for making important decisions about his writing. He would, for example, decide which portions of an interview to include in a story and would decide whether to keep a source confidential. *Id.* at 476.

32. McAllister testified that, as an editor, he would occasionally add facts to Sherwood's stories. For example, if McAllister knew of specific background facts, he would put them in the story. Trial Tr. at 530–31.

33. Sherwood stated that in some circumstances, if an editor happens to know more about the subject than the reporter, the editor might suggest that the reporter speak to certain people. *Id.* at 54. However, the Court notes that according to the testimony of Benjamin Bradlee, Director of the *Post* and former Executive Editor, reporters at the *Post* often start investigating stories without checking with their editors first. *Id.* at 142–43.

34. Sherwood testified that editors at the *Post* do not dictate to reporters how stories should be written. Instead, the reporters and editors work together as part of a collaborative process. Trial Tr. at 59. Pianin, who was one of Sherwood's editors, agreed. Pianin further testified that Sherwood often disagreed with proposed changes, and sometimes convinced his editor not to make a change. *Id.* at 337. Furthermore, the evidence introduced at trial showed that when rewriting had to be done, Sherwood was more likely to do it than his editors. When editors did change stories they usually discussed the changes with Sherwood before printing the story. *Id.* at 169–70, 560.

35. Sherwood's performance evaluations show that the *Post* expected his writing to be smooth, distinctive, and concise, and to contain original phrasing and imagery. The *Post* expected Sherwood to have a narrative, descriptive, and lively style, and to make good use of quotations and anecdotes. Def.'s Ex. 7 at 3, Def.'s Ex. 8 at 3. Coleman testified that reporters at the *Post* are expected to produce artful writing. Trial Tr. at 397. The Court finds that such writing requires imagination and talent.

36. McAllister testified that Sherwood shaped the stories that the *Post* printed about Richmond. McAllister and Sherwood would discuss the stories and work together as part of a collaborative effort, but the writing was ultimately Sherwood's. Trial Tr. at 497.

37. In a June 1989 letter to Kaiser, Sherwood expressed his opinion that he had consistently written with style and clarity about events and people in politics. Def.'s Ex. 15 at 2. Sherwood admitted that reporters at the *Post* do not simply regurgitate facts and that the *Post*'s policy is to present facts within context, with a basis for evaluation. Def.'s Ex. 18 at 30, 35.

38. Sometimes Sherwood's stories were so well-written that they received special treatment. For example, McAllister testified that, in 1985, Sherwood wrote a story about Governor Robb, spontaneously speaking about his experience as a Marine in Vietnam, that was so dramatic that the *Post*'s editors ran it on the front page of the newspaper even though the story had not been planned for the front page. McAllister stated, "[Sherwood] did an excellent job of writing and describing it, and he wrote it in such a dramatic way that the story got on page 1." Trial Tr. at 516. In the text of that article, Sherwood wrote:

The governor seemed to struggle with the flood of memories of Vietnam, at one point seeming to apologize for telling "war stories," but at others recalling the nighttime patrols during which one Marine "stepped on a sleeping NVA North Vietnamese" and Robb himself jumped "literal-

ly in a foxhole that was warm" from an enemy soldier.

He told of docking the pay of one Marine in his unit for a minor discipline problem, only to see that man heroically die "on the very next operation" by distracting enemy fire so others could get to a wounded comrade. "He deliberately exposed himself ... was cut in half by AK47 fire," Robb said to reporters gathered for what was expected to be a press conference on Virginia politics.

Def.'s Ex. 38 (ellipses in original).

39. Sherwood's stories show that his writing required creativity and imagination. For example, the following was the lead in one of Sherwood's articles from 1985 about Virginia politics:

Here in the rural heart of conservative Virginia, they're putting it down where the dogs can get to it: raw, like red meat. There's talk of drinking and suicide, racial rhetoric, sex and drugs and even that one candidate once was on food stamps. There are angry feuds between families. Feuds within families. And there's even a little betting on the side.

Def.'s Ex. 41.

40. An example of Sherwood's writing when he was covering District of Columbia politics is:

David E. Rivers slid into a chair in his lawyer's downtown office yesterday, looking oddly casual and somewhat haggard in wrinkled clothes and shoes with no socks. No sign here of the well-tailored hauteur of the man who could walk that walk of power only days ago in the District Building.

Rivers, who will be 44 on Saturday, is a man on the spot these days.

Pl.'s Ex. 1 at 243.

41. The Court finds that those three articles, as well as many others, including in particular the articles at pages 15–17, 28–32, 52–54, 58–63, 64–69, 201–02, 208–10, 228–31, 250–51, 255–56, and 264–66 of Plaintiff's Exhibit 1, demonstrate that Sherwood's writing required talent, creativity and imagination.

42. Sherwood acknowledges that at least a modicum of analysis is required in both the preparation and the writing of stories for the *Post* regardless of whether they are marked as "news analysis" or "commentary." Def.'s Ex. 18 at 37.

43. The Court finds that the *Washington Post* does not use the markings "news analysis" or "commentary" to indicate whether a story is the product of invention, imagination, or talent. Rather, the evidence discloses that such markings are used to distinguish between "strictly factual reporting" on the one hand, and opinions, analysis, or commentary on the other. Pl.'s Ex. 2 at 5. As Bradlee testified, these markings are used to identify stories that contain little new information and are written to place events in perspective. Trial Tr. at 131.

44. Bradlee further testified that editors do not always agree about whether a certain story should carry the "news analysis" marking. Trial Tr. at 140–41. Coleman testified that relatively little time and attention is focused on making the decision. *Id.* at 424–25.

45. Relatively few of Sherwood's stories carried a "news analysis" or "commentary" label. Among these were his contributions to the "Virginia Notebook" and "District Notebook" sections of the *Post,* which typically bore a "commentary" label. Trial Tr. at 85–86, 538. However, because such labels were not used to indicate whether a reporter's job required invention, imagination, or talent, the Court finds that the presence or absence of the labels is a fact of little relevance to the Court's inquiry. The Court further finds that even stories containing relatively little analysis required invention, imagination, and talent to produce.

46. Elsie Carper worked as a reporter and editor at the *Washington Post* for nearly fifty years. She testified about the duties of newspaper reporters in the 1940s and about how those duties differed from the duties of newspaper reporters in the 1980s. In the 1940s, some reporters worked as "leg men" (or street reporters) and some worked as "rewrite men." Leg men went to events they were assigned to cover and phoned in reports of what they learned. They generally did not write the articles about the sub-

jects that they investigated. Rewrite men, on the other hand, received the phone calls from leg men and wrote the news stories based upon such reports. In general, rewrite men did not gather facts; leg men did not write articles. Other than three or four reporters who had regular beats, the rest of the reporters at the *Post* in the 1940s were leg men or rewrite men. Trial Tr. at 582, 613–14.

47. The *Post* no longer employs leg men, and did not have leg men during Sherwood's tenure. Only a few rewrite men remain as employees, and their principal responsibility is to work on stories that break late at night. Trial Tr. at 582–83, 611.

48. Carper testified that coverage of news by reporters for the *Post* has changed considerably since 1941. Reporters treat stories in much greater depth and include more analysis. In the 1940s, by contrast, stories appearing in the *Post* were short, simplistic, and one-dimensional. Trial Tr. at 595–96, 604. Carper further testified that political reporters in the 1940s did little investigative reporting but instead merely wrote down information doled out by officials like the District Commissioner and the Chief of Police. Trial Tr. at 584–85.

49. Carper testified that, in the 1940s, leg men would cover as many as four or five different stories in one day. *Post* reporters today are expected to work longer on stories and may take weeks, months, or even years to develop a story. Trial Tr. at 571, 598–99. In the 1940s, most reporters would cover only the stories that were assigned to them by their editors. Current *Post* reporters must originate their own story ideas and often do not clear an idea with an editor before beginning to investigate the story.

50. Although the *Post* has covered both local and national events since the 1940s, its focus was much more parochial in the 1940s than it is today. Carper testified that in those days the *Post* relied entirely on wire services for foreign news and had no foreign bureaus. The *Post*'s only outside bureaus at

that time were in Arlington, Alexandria, and Fairfax. Trial Tr. at 585–86, 599.

51. The Court finds that the responsibilities of reporters in the 1940s differed from the responsibilities of reporters in the 1980s at the *Washington Post*. Although most reporting jobs at the *Post* in the 1940s did not require invention, imagination, or talent, the trade has changed so much in the intervening years that modern reporting jobs at the *Post* such as the one that Sherwood held require invention, imagination, and talent.

52. For the foregoing reasons and in light of all the evidence admitted at trial, both direct and circumstantial, the Court finds that Sherwood's primary duty as a reporter for the *Washington Post* consisted of the performance of work requiring invention, imagination, and talent.

### CONCLUSIONS OF LAW

Only two legal disputes survive in this case. The first concerns the extent to which the Court, in interpreting the Labor Department regulations governing the professional status of high-salaried employees, should rely on language from regulations governing low-salaried employees. The second dispute concerns the question of whether the Court should shape its interpretation of the regulations by referring to nonbinding Labor Department interpretative statements issued forty years ago. For purposes of the FLSA, 29 U.S.C. §§ 203, 207, Sherwood was an employee "engaged in commerce" and the *Washington Post* was an "enterprise" and an "employer." Def.'s Ex. 21 at 1–2.

### A. The "Short Test" and the "Long Test"

■ The overtime provisions of the FLSA do not apply to "any employee employed in a bona fide ... professional capacity." 29 U.S.C.A. § 213(a)(1) (1988). The Labor Department regulation defining the term "artistic professional"[1] creates two tests for determining whether an employee falls within this exemption. The first, known as the "short test," applies to all employees who earn more

---

1. The Labor Regulations outline three types of professionals: "learned," "artistic," and "teachers." Sherwood's duties as a reporter clearly do

not fit into the categories of "learned" or "teachers." *See Reich v. Gateway Press, Inc.,* 13 F.3d 685, 697–98 (3rd Cir.1994).

than $250 per week. Under this test, an employee is a professional if the employee's

> primary duty consists of the performance ... of work requiring invention, imagination, or talent in a recognized field of artistic endeavor.

29 C.F.R. § 541.3(e) (1992). A more detailed "long test" applies to employees who earn less than $250 per week. An employee is an artistic professional under this test if he or she satisfies several conditions that are not found in the short test, and if his or her primary duty consists of

> [w]ork that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee.

*Id.* § 541.3(a)(2). The parties agree that Sherwood earned more than $250 per week, and so the court must apply the short test in determining whether he is a professional within the meaning of the FLSA.

Sherwood argues, however, that language from the long test should be read into the short test:

> Both parties agree that this is a "short test" case. However, the "primary duty" analysis of the "long test" artistic exemption applies equally to the "short test." Accordingly, the standards of whether an employee's primary duty is "original and creative" within the meaning of the regulations is common to both tests under the Act.
>
> ....
>
> ... [T]he "short" test does not alter the core "primary duty" requirement which is central to the regulations as a whole. Thus, the "short" test for an "artistic" professional—the test applicable in this case—is fulfilled by an employer satisfying the identical "primary duty" requirement applicable under the "artistic" "long" test.

Pl.'s Mem. in Support of Proposed Findings of Fact & Conclusions of Law at 46–47, 49 (emphasis and citation omitted). Sherwood further argues that because the long test's

definition of "primary duty" applies, the Labor Department's forty-year-old interpretations of the regulations should apply to this case. *See id.* at 49.

The Court cannot accept Sherwood's reading of the regulations. Although both the short test and the long test contain the term "primary duty," which is "central to the regulations as a whole," nothing in the regulations compels the Court to define "primary duty" by reference to the language of the long test. As Sherwood observes in his brief, the Labor Department interpretations define "primary duty" in a commonsense fashion, as " 'the major part, or over 50 percent, of the employee's time.' " Pl.'s Mem. in Support of Proposed Findings of Fact & Conclusions of Law at 47 n. 56 (quoting 29 C.F.R. §§ 541.103, 541.304). The long test does not define "primary duty," but instead describes the sort of work that an employee's primary duty must "consist[ ] of" if he is to be considered an exempt professional. The short test does the same, but uses different words and describes a different sort of work. Each test, therefore, superimposes its own independent set of requirements upon the general "primary duty" concept.

The ramifications of this distinction are significant. Although the two tests are similarly worded, a few differences make the long test substantially harder to meet than the short test. Each test exempts an employee "whose primary duty consists of the performance" of work "in a recognized field of artistic endeavor" if the work involves "invention, imagination, or talent." *Compare* 29 C.F.R. § 541.3(a)(2) (1992) *with id.* § 541.3(e). Under the long test, however, an employee's primary duty must consist of work that is "original and creative in character." The short test contains no such requirement. *See Reich v. Gateway Press, Inc.*, 13 F.3d 685, 698 (3rd Cir.1994). Furthermore, under the long test the result of the work must *depend primarily* on the employee's invention, imagination, or talent, whereas the short test exempts work that merely *requires* invention, imagination, or talent.

When this case was before the Court of Appeals, that Court explicitly stated that it "offer[ed] no view on the merits of this case," but instead simply held "that the case was

**1480**

improperly decided on summary judgment." *Sherwood v. Washington Post,* 871 F.2d 1144, 1148 n. 5 (D.C.Cir.1989). In reversing the district court's grant of summary judgment, the Court of Appeals relied on the parties' characterization of the issues, and thus observed that "[t]he parties *seem* to agree that the legal standard ... is whether [Sherwood's] work is *predominantly* original or creative." *Id.* at 1146 (first emphasis added). The Court of Appeals did not address the difference between the short and long tests, and did not set forth any rationale that might justify using language from the long test in a case involving the short test. Since that opinion was issued, the Third Circuit has recognized the distinctions between the short and the long tests. *See Gateway Press,* 13 F.3d at 697–99.

■ The Court therefore concludes that only the language from the short test applies in this case. As the Court's findings of fact demonstrate, Sherwood's work was clearly exempt under the short test because it required invention, imagination, and talent.[2] The Court notes the difference between the primary duty of Sherwood at the *Washington Post* and the primary duty of the reporters at local, weekly papers serving the Pittsburgh suburbs in *Gateway Press.* As the Third Circuit noted:

> There is a difference in duties between reporters writing for the *Washington Post* and those who write for a local weekly newspaper.... [W]e believe that the type of fact gathering done by the Gateway reporters is not the type of fact gathering that demands the skill or expertise of an investigative journalist for the *Philadelphia Inquirer* or *Washington Post,* or a bureau chief for the *New York Times.*

*Gateway Press,* 13 F.3d at 699 n. 17, 700.

**B. The Relevance of the Labor Department Interpretations**

■ The regulation that establishes the short and long tests, 29 C.F.R. § 541.3, is the

only regulation that defines the scope of the exemption for professionals under the FLSA. In addition to this regulation, the Labor Department has issued "interpretations" that elaborate upon the language in the regulation. Sherwood argues strenuously that this case is governed by one of these interpretations, which reads:

> (1) .... Exemption for newspaper writers as professional employees is normally available only under the provisions for professional employees of the "artistic" type. Newspaper writing of the exempt type must, therefore, be "predominantly original and creative in character." Only writing which is analytical, interpretative or highly individualized is considered to be creative in nature.... Newspaper writers commonly performing work which is original and creative within the meaning of § 541.3 are editorial writers, columnists, critics, and "top-flight" writers of analytical and interpretative articles.

> (2) The reporting of news, the rewriting of stories received from various sources, or the routine editorial work of a newspaper is not predominantly original and creative in character within the meaning of § 541.3 and must be considered as nonexempt work. Thus, a reporter or news writer ordinarily collects facts about news events by investigation, interview, or personal observation and writes stories reporting these events for publication, or submits the facts to a rewrite man or other editorial employees for story preparation. Such work is nonexempt work. The leg man, the reporter covering a police beat, the reporter sent out under specific instructions to cover a murder, fire, accident, ship arrival, convention, sport event, etc., are normally performing duties which are not professional in nature within the meaning of the act and § 541.3.

---

**2.** The parties seem to believe that Sherwood's "consistent exercise of discretion and judgment" is somehow relevant to this case. *See, e.g.,* Pl.'s Proposed Findings of Fact & Conclusions of Law at 5; Def.'s Proposed Findings of Fact & Conclusions of Law at 31–35. Judgment and discretion, however, are relevant only when a person may be exempt as a learned or teaching professional,

not when a person may be exempt as an artistic professional. *See* 29 C.F.R. §§ 541.3(e), 541.315(a) (1992). As the Labor Department has explained in its interpretations of § 541.3, "[e]xemption for newspaper writers as professional employees is normally available only under the provisions for professional employees of the 'artistic' type." *Id.* § 541.302(f)(1).

29 C.F.R. § 541.302(f) (1992). This interpretation is not a regulation promulgated according to the notice and comment requirements of the Administrative Procedure Act; it is merely an expression of the Labor Department's understanding of § 541.3. The interpretation has not been revised since 1949.

■ The Court is under no obligation to follow the Labor Department's interpretations. Throughout these proceedings, Sherwood's counsel has insisted upon referring to the interpretations as "regulations." Yet they are not regulations, and therefore they do not have the force of law. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Indeed, they "cannot be decisive in the context of present day journalism. They are useful guides, nothing more." *Sherwood v. Washington Post*, 677 F.Supp. 9, 14 (D.D.C.1988) (Gesell, J.), *rev'd on other grounds*, 871 F.2d 1144 (D.C.Cir.1989). The Third Circuit has recently held that the interpretations at issue do not have the force of law. *See Gateway Press*, 13 F.3d at 699 n. 17 ("The DOL interpretations do not have the force of law.... They are entitled to some deference, however.").

Sherwood cites several cases in support of his argument that interpretations such as these are "binding" on the Court. *See* Pl.'s Mem. in Support of Proposed Findings of Fact & Conclusions of Law at 41–42, 58 n. 70. These cases are merely an odd assortment of decisions that mistakenly refer to the interpretations as "regulations." *See, e.g., Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 184 (3d Cir.) (erroneously referring to 29 C.F.R. § 541.118(b) as a "regulation"), *cert. denied*, 488 U.S. 925, 109 S.Ct. 307, 102 L.Ed.2d 326 (1988); *Clark v. J.M. Benson Co.*, 789 F.2d 282, 286 (4th Cir.1986) (erroneously referring to 29 C.F.R. §§ 541.103, 541.206(b) as "regulations"); *Roney v. United States*, 790 F.Supp. 23, 27 (D.D.C.1992) (erroneously referring to 29 C.F.R. § 541.205 as a "regulation"). None of these cases explicitly hold that the interpretations are "binding." The most these cases show is that on some occasions, when the difference between regulations and interpretations was

not at issue, courts have loosely referred to the interpretations as "regulations," perhaps because they are collected in the Code of Federal Regulations. Agency interpretations do not acquire the force of law simply because a court accidentally mischaracterizes them.

■ In deciding what weight to accord these nonbinding interpretations, the Court can consider "the thoroughness evident in [the Department's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140, 65 S.Ct. at 164. After considering these factors, the Court concludes that the Labor Department interpretations should be accorded very little weight. The evidence submitted at trial demonstrated that in the 1940s, when the interpretations were drafted, newspapers were staffed primarily by "leg men" and "rewrite men" whose jobs consisted entirely of doing what they were told to do. Stories were simple, one-dimensional, and contained virtually no analysis. *See* ¶¶ 45–51 *supra*. In the forty years since then, the era of the leg men and rewrite men has passed, and the average reporter at the *Washington Post* displays invention, imagination, and talent that only a few "top-flight" reporters could have demonstrated in 1949. The interpretations still refer to "leg men" and "rewrite men," thus clearly relying upon an outdated conception of the news profession. Their "power to persuade" is meager indeed.

The Court therefore rejects the interpretations' conclusion that "[t]he reporting of news ... must be considered as nonexempt work." This blanket assertion cannot apply to modern reporters who, like Sherwood, must exercise invention, imagination, and talent to perform their jobs. The Court likewise rejects the interpretations' assertion that a reporter's work is exempt if he or she "collects facts about news events by investigation, interview, or personal observation and writes stories reporting these events for publication." The nature of news reporting and writing has changed so dramatically over the past forty years that this conclusion is clearly

false. Similarly, whether Sherwood was an "editorial writer, columnist, critic, or 'topflight' writer of analytical and interpretative articles" is irrelevant. *See* Pl.'s Proposed Findings of Fact & Conclusions of Law at 32. In rejecting the conclusion of the interpretations, the Court again distinguishes the facts in this case from the facts in *Gateway Press*, 13 F.3d 685. The Third Circuit held that local, weekly newspaper reporters, whose primary duties consisted of gathering facts for publications such as school lunch menus and wedding announcements, were not "artistic professionals" under the short test. *See Gateway Press*, 13 F.3d at 699. As the Third Circuit itself noted, that type of small town reporting is not the type of reporting that demands the skill or expertise of an investigative journalist at the *Post*. *Id.* at 700. The Court holds that Sherwood's reporting job at the *Post* required invention, imagination, and talent that was not required of the Gateway Press reporters. Sherwood covered subjects such as complex D.C. politics, Virginia politics, and vice presidential candidates—not school lunch menus and church news.

Finally, the Court notes that the last sentence of the Labor Department's interpretation, which is the only sentence containing a specific description of a reporter's duties, still accurately describes nonexempt work. This sentence states that "[t]he leg man, the reporter covering a police beat, the reporter sent out under specific instructions to cover a murder, fire, accident, ship arrival, convention, sport event, etc., are normally performing duties which are not professional in nature." This sentence portrays the daily work of a 1950s reporter, a species of newswriter who was nearly always "sent out under specific instructions" to cover particular stories. If Sherwood had been this sort of reporter, or a small press reporter as in *Gateway Press*, then his work might have fallen within the scope of the exemption. Sherwood, however, was not a robot run by his editors. *See* ¶¶ 28–34, *supra.* His job required him to originate his own story ideas, maintain a wide network of sources, write engaging, imaginative prose, and produce stories containing thoughtful analysis of complex issues. A "leg man" or "rewrite man" could never do so much.

For these reasons, the Court finds and concludes that Sherwood's primary duty consisted of the performance of work requiring invention, imagination, and talent. His work was therefore exempt from the overtime provisions of the FLSA. The Court will accordingly enter judgment in favor of the defendant.