**Teresa M. SHAW, Plaintiff,**

v.

**PRENTICE HALL, INC. a/k/a Macmillan Computer Publishing, Defendant.**

**No. IP 95–1434–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

July 18, 1997.

Robert S. Rifkin, Maurer Rifkin & Hill, Indianapolis, IN, for Plaintiff.

Richard A. Smikle, Ice Miller Donadio & Ryan, Indianapolis, IN, for Defendant.

## FACTS OF FACT AND CONCLUSIONS OF LAW

BARKER, Chief Judge.

This matter having come before the Court for trial, and the Court having heard and examined and considered the evidence, and being duly advised in the premises, now finds as follows:

### I FINDINGS OF FACT

1. This is an action for overtime pay brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*

2. Plaintiff Teresa M. Shaw ("Shaw") was employed as a Production Editor and Senior Production Editor at Prentice Hall Computer Publishing and its successor, Macmillan Computer Publishing. Prentice Hall, Inc. is the real defendant in interest and was the parent of Prentice Hall Computer Publishing and is the parent of Macmillan Computer Publishing. Because the current operating entity is Macmillan Computer Publishing, "Macmillan" shall be used throughout to designate the defendant. Macmillan is, as was its predecessor, a publisher of computer manuals.

3. Shaw was hired as a Production Editor beginning May 10, 1993. She became a Senior Production Editor on April 1, 1995. Her last date of employment was September 18, 1995.

4. During her employment with Defendant, Shaw was paid a yearly salary. Her yearly salary was as follows:

| | |
|---|---|
| 5/10/93—4/30/94 | $24,000 |
| 5/1/94—12/11/94 | $25,200 |
| 12/12/94—3/31/95 | $25,800 |
| 4/1/95–9/18/95 | $27,850 |

5. Neither Macmillan nor Shaw kept records of the hours worked by Shaw or other production editors, although it is undisputed that Shaw and other production editors at Macmillan frequently worked more than forty (40) hours per week in order to meet publishing deadlines. Shaw was never paid overtime compensation for any hours she worked over forty (40) hours per week during her employment.

6. When Shaw was interviewed for the position of production editor, she understood that she would be expected to work as much as necessary to get the job done, including evenings and weekends, and that her salary was intended to cover all hours worked.

7. Shaw's supervisors at Macmillan, Liz Keaffaber and Michael Cunningham, had an informal arrangement whereby employees would sometimes be allowed to take "comp time" to compensate for overtime hours worked. This "comp time" arrangement was not, however, a strict hour-for-hour system; rather, an employee might be told to "come in late tomorrow" or "take some time off" to compensate for working extra hours.

8. Shaw was required to take an editing test to be considered for the position of production editor. As production editor, Shaw performed various duties including both editing tasks and managerial or "administrative" tasks. Copy editors and proofreaders edited manuscripts for grammar, word choice and spelling. Production editors approved or disapproved proofreader's and copy editor's suggestions, and edited the manuscript for clarity and readability as well as for grammar, word choice and spelling. Shaw's edits were not reviewed by anyone.

9. In performing her edits, Shaw had to understand the overall purpose and message of the book, as well as the design and editing guidelines for the series of books. She had to look for ways to make the ideas flow more smoothly and understandably, considering the intended audience. Shaw could recast or rewrite sentences to improve clarity and readability so long as the edit did not change the technical content. She could also help to "shape" a book by writing queries to the author with suggestions for more substantive changes, such as suggesting that the author

include a diagram or figure to help explain a point.

10. While Shaw did have to work within set editorial guidelines, she used independent judgment and discretion in determining when and how those guidelines applied. Guidelines were sometimes as vague as "keep it simple," and there were not applicable guidelines for every editing decision Shaw had to make.

11. Another of Shaw's editing tasks was to review the book's index to make sure all appropriate areas were covered and that the index was "user friendly." There were no guidelines or checklists to follow in performing this task; rather, Shaw had to exercise judgment and have an good understanding of what were the most important concepts in the book.

12. Shaw's editing duties also included some rather simple and tedious tasks, such as hand-copying verbatim the "call outs" (explanatory text at the side of an illustration or figure) on the hard copy of a manuscript and comparing reproductions with the author's manuscript to make sure the figures matched.

13. Shaw did not merely "edit" manuscripts. The credible testimony adduced at trial shows that her primary duty, that which was most valuable to Macmillan, was to manage and coordinate book projects through the entire editorial and production process. Shaw served as a link between the managing editor and other members of the editing/production team. She was responsible for monitoring and enforcing internal deadlines within the overall schedule set by her managing editor.[1]

14. The ability to anticipate and plan within overall deadlines was crucial for production editors and required independent judgment and discretion. If it appeared that a book would not meet a deadline, Shaw was expected to try and work out the problem within the production team before going to the managing editor for assistance. Production editors' input was also considered by management in setting overall deadlines and deciding whether to re-prioritize or change deadlines.

15. Michael Cunningham and Liz Keaffaber, Shaw's supervisors and managing editors at Macmillan, testified that while Shaw's position did not require creativity, imagination or originality, it did require good judgment, organization, and good troubleshooting, time management and project management skills.

16. Shaw's position required her to do a substantial amount of troubleshooting. In a performance appraisal of Shaw's work performance between May 1994 and April 1995, her supervisors noted that she was "proactive" in identifying potential problems before they reach crisis level, and that "[s]he doesn't hesitate to recommend suggestions." (Exh. 25). The same performance appraisal noted that Shaw's "extraordinary organizational skills and determination to get the job done inspire her to find creative ways to meet her deadlines," and that she created the tracking forms used by editors in tracking the progress of books. (Id.) The appraisal also indicates that Shaw was expected to provide new project ideas, propose revisions to existing procedures, complete a proposal for "Idiot's Guide art cataloging procedures," and complete and implement a style guide. (Id.)

17. Shaw also served as a member of a design team that looked at redesigning the "Idiot's Guide" series of computer manuals. In this capacity she made suggestions on how to improve established designs. She also participated in and had the opportunity to provide input at "launch meetings" for book projects.

18. Shaw helped train new employees and gave feedback to copy editors on their work, and provided some input into the selection of freelance copy editors and technical editors based on her assessment of whether those freelancers had done good work on past projects.

19. As senior production editor, Shaw performed the same duties as a production editor, in addition to several additional responsibilities, including coordinating book

---

1. The "Production Editor Guidelines" emphasized that "[i]t is [the production editor's] responsibility to make sure that everything is running on schedule." (Exhibit 15).

reprints corrections with editorial and manufacturing staffs, attending weekly senior editor meetings, working as a contact person for the Managing Editor with the editorial staff, and acting as a resource for other production editors and copy editors on project issues, prioritizing work, and troubleshooting when necessary. (See Exh. 19).

## II. CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, this Court makes the following Conclusions of Law:

1. This Court has jurisdiction over the parties.

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

3. Section 7(a)(1) of the Fair Labor Standards Act ("FLSA") generally requires all employers to pay their employees one and one-half times their regular rate of pay for all hours worked over forty hours per week. Section 13(a)(1) of the FLSA exempts from this overtime wage requirement employees employed in a "bona fide executive, administrative, or professional capacity," as those terms are defined by the regulations of the Department of Labor. 29 U.S.C. § 213(a)(1).

■ 4. The burden is on the employer to prove by a preponderance of the evidence that the employee fits within the exemption or exemptions claimed. *Spinden v. GS Roofing Products Co., Inc.*, 94 F.3d 421 (8th Cir.1996), *reh'g denied, cert. denied*, — U.S. —, 117 S.Ct. 1254, 137 L.Ed.2d 334 (1997); *Freeman v. National Broadcasting Company, Inc.*, 80 F.3d 78, 82 (2nd Cir.1996); *Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282, 286 (4th Cir.1986) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974)). "[B]ecause of the remedial nature of the FLSA, exemptions are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'" *Reich v. Newspapers of New England Inc.*, 44 F.3d 1060, 1070 (1st Cir.1995) (quoting *Arnold v. Ben Kanowsky* Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); *Secretary of Labor v. DeSisto*, 929 F.2d 789, 797 (1st Cir.1991)).

5. Macmillan contends that Shaw was exempt from the overtime wage provisions of the FLSA either as an administrative or an artistic professional employee.

6. The regulations defining the requirements for the artistic professional and administrative exemptions create two different tests, a "long test" and a "short test," for determining whether an employee falls within each of these exemptions. It is uncontested that Shaw's annual salary subjects her to the "short test" for each exemption, because she met the minimum salary requirement of $250 per week. 29 C.F.R. §§ 541.2(e); 541.3(e).

### A. Artistic Professional Exemption

■ 7. Under the short test, an employee is exempt as an artistic professional if the employee's "primary duty consists of the performance ... of work requiring invention, imagination, or talent in a recognized field of artistic endeavor." 29 C.F.R. §§ 541.3(e), 541.315. "Exempt artistic professionals may be found in many fields, including music, writing, the theater, and the plastic and graphic arts." *Reich v. Newspapers of New England*, 44 F.3d at 1071. We conclude that book publishing and editing is a "field of artistic endeavor" for the purposes of the artistic professional exemption.

8. Under the more exacting "long test," the employee's primary duty must consist of "work that is original and creative in character ..., and the result of which *primarily* on the intention, imagination, or talent of the employee." 29 C.F.R. § 543.3(a)(2) (emphasis added). The short test does not contain these requirements. *Freeman*, 80 F.3d at 83–84 (noting that long test is significantly more difficult to meet than short test and interpretations relating to long test do not also apply to short test); *Reich v. Newspapers of New England*, 44 F.3d at 1074 (holding that erroneous application of the "original and creative" requirement to short test employees was harmless error because those employees also failed to qualify as exempt under the short test); *Sherwood v. Washing-*

*ton Post,* 871 F.Supp. 1471, 1479 (D.D.C. 1994).

9. Under the short test, "the employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform," and is not determined solely with regard to what tasks consume the majority of her time. *Bohn v. Park City Group, Inc.,* 94 F.3d 1457, 1461 (10th Cir. 1996), *reh'g denied,* (quoting *Dalheim v. KDFW–TV,* 918 F.2d 1220, 1227 (5th Cir. 1990)); *Spinden,* 94 F.3d at 427.

10. The parties have not cited any cases applying the FLSA exemption standards to production editors in the book publishing industry, nor is the Court aware of any. However, analogous cases show that, generally, employees who have been found to meet the artistic professional exemption performed work that was much more inventive and "artistic" than Shaw's work. In *Freeman, supra,* the Second Circuit found that a newswriter, producer and field producer for the N.B.C. Nightly News were qualified for the artistic professional exemption. The newswriter was responsible for coordinating coverage of all the United States-sourced news, wrote approximately one-third of each Nightly news broadcast, and held "among the most highly coveted jobs in broadcast journalism, the pinnacle of the profession." *Freeman,* 80 F.3d at 81. He developed scripts for the newscast without guidance from other staff members in working to "create something of a synergy on the words and pictures to tell the story." *Id.* The producer generated domestic story ideas for the news program; developed, oversaw and approved stories put together by correspondents and field producers; reviewed, edited and approved each story's script; and also wrote and produced a special program segment. *Id.* The Field Producer gathered, developed, shot, wrote and edited news stories. He directed a camera crew and decided whom to interview, whether to do the interview on camera, which questions to ask, and what visual elements to video-tape. He exercised editorial control over the news stories he produced, researched facts, developed story elements, interviewed subjects, wrote the script, and su-

pervised the editing of the videotape. *Id.* In *Sherwood, supra,* the District Court for the District of Columbia found that "a newspaper reporter was exempt as an artistic professional where that reporter's duties included" originating story ideas, cultivating sources, and "utiliz[ing] his imagination and other skills in seeking information." *Sherwood* 871 F.Supp. at 1473. The Court found that the reporter's position was a "prestigious, competitive job among journalists," and that his "job duty of originating story ideas required invention and imagination." *Id.,* at 1473–74.

11. The record shows that Shaw's position, unlike those at issue in *Freeman* and *Sherwood,* did not "require invention, imagination or talent." While she did perform some arguably creative editing tasks, her principal duty was to manage a book project through the editing and publishing process, work which required diligence, good time management, organization and assertiveness, but not invention, imagination or talent in a artistic field of endeavor. *See Reich v. Newspapers of New England,* 44 F.3d at 1075 (newspaper writers whose work depends on "intelligence, diligence, and accuracy" are not artistic professionals, distinguishing such work from that which depends on "invention, imagination, or talent."). Therefore we conclude that Shaw's work as a production editor and senior production editor does not place her within the FLSA's artistic professional exemption.

## B. Administrative Exemption

12. Under the short test for the administrative exemption, an employee is exempt if (1) her primary duty consists of "the performance of office or nonmanual work directly related to management policies or general business operations of [her] employer or [her] employer's customers," and (2) "includes work requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.2(e)(2) incorporating § 541.2(a)(1); *Spinden,* 94 F.3d at 426.

13. The Secretary of Labor's interpretations of the applicable regulations instruct that the first, "directly related to management policies or general business operations," prong of the short test is satisfied

where the employee's primary duty consists of "those types of activities relating to the administrative operations of a business as distinguished from 'production,'" and who "perform work of substantial importance to the management or operation of the business of his employer or his employer's customers." 29 C.F.R. § 541.205(a):

14. Macmillan argues that we should not apply the administrative/production distinction discussed in the interpretive regulations because a) the interpretations do not carry the force of law and b) the administrative/production dichotomy is not a useful distinction in the "white collar" context. We reject this argument because, although we recognize that the interpretations are not binding, they are persuasive and have been consistently applied by courts in both the "blue collar" manufacturing and "white collar" non-manufacturing contexts. *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896, 903 (3d Cir.1991) (applying administrative/production dichotomy to wholesale-distribution business), *cert denied*, 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992); *Freeman v. National Broadcasting Company, Inc.*, 846 F.Supp. 1109, 1153 (S.D.N.Y.1993), *rev'd on other grounds*, 80 F.3d 78 (2nd Cir.1996) (holding that work of television news reporters, producers, editors and directors "relates essentially to producing the primary product of a broadcast news organization ... rather than to defendant's administrative operations")[2]; *Reich v. American International Adjustment Company. Inc.*, 902 F.Supp. 321, 325 (D.Conn.1994) (finding that automobile damage appraisers "perform the day-to-day activities of the business ... [and] do not administer the business of AIAC."); *Reich v. New York* 3 F.3d 581, 587–88 (2nd Cir.1993) (Police Bureau of Criminal Investigations Investigators "do not administer the affairs of [the bureau]; ... the primary activities of the BCI Investiga-

tors place them squarely on the 'production' side of the line.'"), *cert. denied*, 510 U.S. 1163, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994); *Dalheim*, 918 F.2d at 1230–31 (news producers' duties relate to production of news product and not to administrative operations).

█ 15. In light of the case law cited above, we find that Shaw's work as a production editor and senior production editor falls squarely on the production side of the line and is not per se "administrative" work.

█ 16. Even an employee whose work is more accurately described as production rather than administrative work can still be considered an exempt administrative employee. The regulations instruct that "the phrase 'directly related to management policies or general business operations' is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole." 29 C.F.R. § 541.205(c). "Work may also be 'directly related' if it is of 'substantial importance' to the business operations of the enterprise in that it involves 'major assignments in conducting the operations of the business, or ... affects business operations to a substantial degree.'" *Dalheim*, 918 F.2d at 1230 (quoting 29 C.F.R. § 541.205(c)); *Freeman*, 846 F.Supp. 1109, 1153 (S.D.N.Y.1993).[3]

█ 17. The fact that an employee's performance "may have a significant profit-and-loss impact" on the employer's business is not sufficient to establish that the employee's work is of substantial importance to the defendant's business or affects business operations "to a substantial degree." *Dalheim*, 918 F.2d at 1231; *Freeman*, 846 F.Supp. at 1154. We must look to "the nature of the work, not its ultimate consequence," in determining whether Shaw's work is of substantial importance to Macmillan. *Dalheim*, 918

**2.** The District Court in *Freeman* held that the plaintiffs were not exempt under either the artistic professional or administrative categories. The Second Circuit reversed, holding that the plaintiffs were exempt as artistic professionals, but did not discuss the District Court's holding regarding the administrative exemption. *See*, 80 F.3d 78.

**3.** The District Court opinion in *Dalheim* stated that "[t]he sole way for production or operations-type work to meet the 'directly related' element is if the employee is one who carries 'out major assignments in conducting the operations of the business or whose work affects business operations to a substantial degree ...'" *Dalheim v. KDFW–TV*, 706 F.Supp. 493, 506 (N.D.Tex.1988).

F.2d at 1231 (quoting *Clark v. J.M. Benson Co.,* 789 F.2d 282, 287 (4th Cir.1986)).

 18. We conclude that Macmillan has met its burden of showing that, as a production editor and senior production editor, Shaw carried out major assignments in conducting the operations of the business and, thus, that her work satisfies the "directly related" prong of the administrative exempt short test. Specifically, Macmillan has established that Shaw was ultimately responsible for managing entire book projects through the editing and production processes. She served as a coordinator between various members of the production and editing team and the managing editor and was ultimately responsible both for the timeliness and the quality of the book. This primary duty of a production editor is analogous to the administrative duties of an exempt systems analyst, which position is described at 29 C.F.R. § 541.205(c)(7) as: "concerned with the planning, scheduling, and coordination of activities which are required to develop systems for processing data to obtain solutions to complex business, scientific, or engineering problems of his employer or his employer's customers."

19. Shaw's work also, satisfies the second prong of the administrative exemption short test, which requires that the employee's primary duty include "work requiring exercise of discretion and independent judgment." 29 C.F.R. § 541.2(e).[4] The exercise of discretion and independent judgment means that the employee "has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance," 29 C.F.R. § 541.207(a), and is not to be confused with "the use of skill in applying techniques, procedures, or specific standards." 29 C.F.R. § 541.207(b); *Reich v. American Int'l Adjustment Co., Inc.,* 902 F.Supp. at 324.

20. "The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.207(e)(1).

21. Both in the performance of her editing duties and in her primary duty of managing book projects through the editorial and production process, · Shaw exercised a substantial amount of discretion and independent judgment. For instance, Shaw exercised discretion and independent judgment in making editorial choices to improve the clarity and user-friendliness of the text and the index, approving or disapproving proofreaders' and copy editors' edits, making decisions regarding how to best manage the process in order to meet deadlines set by her managing editor, making suggestions to her managing editor regarding re-prioritizing or changing those ultimate deadlines, and providing input into the selection of freelance copy editors and technical editors. These decisions were made independently and related to matters of great importance to Macmillan, as the success of Macmillan's business depends largely on meeting production deadlines and producing books that are easily understood by readers. *See Orphanos v. Charles Industries, Ltd.,* 1996 WL 437380 at *3 (N.D.Ill, July 26, 1996) (Plaintiff's exercise of discretion and judgment was "real and substantial" because "success of defendant's business depended in part of the effectiveness of plaintiff's troubleshooting.") In addition, Shaw's input as a member of the "Idiot's Guide" design team and as a participant in book project launch meetings undoubtedly gave her the opportunity to exercise independent judgment and discretion.

22. For the above reasons, this Court concludes that Shaw's work both as a production editor and as a senior production editor satisfies the requirements for the administrative exemption from the FLSA's overtime wage requirements. Accordingly, we find for Defendant Macmillan and against Plaintiff Shaw on her claim for overtime pay.

---

4. We note that, while the long test requires that discretion and independent judgment be exercised "customarily and regularly," the short test only requires that the primary duty "include" the exercise of discretion and independent judgment.

*See* 29 C.F.R. §§ 541.2, 541.214; *see also Reich v. American Int'l Adjustment Co. Inc.,* 902 F.Supp. at 323, n. 2; *Dalheim,* 706 F.Supp. at 508, n. 17.

*JUDGMENT*

In accord with the Court's entry in the above named action, judgment is entered in favor of Defendant Macmillan and against Plaintiff Teresa M. Shaw on all of Plaintiff's claims. This matter is hereby dismissed with prejudice. Each of the parties is to bear its respective costs in this case.