Michael **BURKE**, Stevens Moyer, William Wood, and all persons similarly situated, Plaintiffs,

v.

**COUNTY OF MONROE**, Defendant.

No. 01–CV–6281 CJS.

United States District Court, W.D. New York.

Sept. 18, 2002.

Timothy Connick, Esq., CSEA, Inc. Local 1000, AFSCME, AFL–CIO, Nancy E. Hoffman, Esq., Civil Service Employees Association, Inc., Albany, for Plaintiffs.

Michael E. Davis, Esq., Department of Law, Rochester, for Defendant.

## DECISION AND ORDER

SIRAGUSA, District Judge.

### INTRODUCTION

Plaintiffs brought this action claiming that defendant violated the Fair Labor Standards Act of 1938, as amended, 29 U.S.Code § 201, *et seq.*, by improperly classifying their computer networking administrator jobs as exempt from time-and-a-half overtime pay. The case is now before the Court on defendant's motion (docket # 12) for summary judgment. For the reasons stated below, the Court denies defendant's application.

### SUMMARY JUDGMENT STANDARD

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley*, 274 F.3d 677 (2d Cir.2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir.2001); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir.1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. FED. R. CIV. P. 56(e). Furthermore, the party opposing summary judgment "may not create an

issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections,* 84 F.3d 614, 619 (2d Cir.1996).

## BACKGROUND

Plaintiffs Michael Burke ("Burke"), Stevens Moyer ("Moyer") and William Wood ("Wood") are employees of the County of Monroe, Department of Information Services. Moyer and Wood worked a 40–hour workweek and Burke's work week was 35 hours. Each has been compensated for overtime worked in excess of 40 hours per week, either by regular hourly pay or compensatory time, since defendant has classified each of their jobs as exempt from the Fair Labor Standards Act ("FLSA"). Plaintiffs commenced this suit on June 4, 2001, covering the period from June 4, 1999 [1] to the present.

In December 2000, defendant reclassified plaintiffs' positions by changing their job titles, although each one's duties remained substantially the same, as did their exempt status.

### A. Stevens Moyer

Moyer's title was changed from "Network Administrator" to "Network Administrator I"; however, his weekly salary remained the same. In addition to Network Administrator I, there are also the positions of Network Administrator II and III, with I being the highest. As a Network Administrator I, Moyer's duties included: administering, maintaining, installing and operating computer networks, file servers, and operating systems; maintaining security, backup, and systems interconnectivity; analyzing hardware and software network problems; coordinating workshops; performing network-related problem solving for the help desk; advising the Microcomputer Systems Support Team on the configuration of computers to be added to the network; occasionally researching and evaluating new products; and troubleshooting by locating the source of a problem using information such as the type of problem, checklists, manuals, vendor information, and prior problems. Network Administrator I job description (attached as Exhibit H to Defendant's Exhibits Submitted in Support of Motion for Summary Judgment).

At his deposition, Moyer clarified that his duties consisted primarily of operating computer software. For example, he stated that administering servers meant that he added new printers to Novell servers using the built-in software to type data into the operating system's database, allowing the new printers to communicate with the file server, thereby permitting computer users access to print on them. He also stated that administering included adding new users by utilizing the Novell software utility for that purpose. Additionally, he stated that another of his duties was installing and maintaining the Novell software. This consisted of putting the compact disc ("CD") in the machine and copying the operating system onto the server's hard drive. Maintaining, he stated, meant installing the latest updates to the software, including service patches. Another of his duties, he said, was to advise the micro computer group about how to configure new computers for use on the network. He accomplished this by consulting Novell manuals and finding the optimum settings. Additionally, he said he researched new products, sometimes even

---

**1.** Plaintiffs' memorandum of law states that the claims go back to May 1998; however, plaintiffs' statement of facts accepts defendant's assertion that the earliest date for which plaintiffs may claim benefits under this suit is June 4, 1999.

testing them, and made recommendations as to whether they should be adopted. In describing the process of troubleshooting, Moyer testified,

> to troubleshoot a problem is basically to identify where a problem is and what is causing the problem. That may involve a number of procedures. A lot of them have to do with just knowing and understanding how the hardware works, how the operating system works, how the two of them work together and going through and identifying—how can I phrase this? You start at one end of the problem almost like a flow chart. Go through step by step until all of a sudden things stop working. Now you've identified where the problem is.

Moyer dep. at 53.

### B. *William Wood*

Wood's current position is titled as "Network Administrator II," and was formerly titled "Assistant Network Administrator." The Network Administrator II job description provided by defendant contains the following description of typical work activities (along with a caveat that all need not be performed and other may be performed, though not listed):

> Analyzes and takes corrective action of computers and data communications hardware and software network problems;
>
> Demonstrates and trains users in the operation and maintenance of computer hardware and software;
>
> Monitors the security and efficiency of computer systems and takes corrective action when necessary;
>
> Configures department work stations and networks;
>
> Tests new computer hardware and software.

Network Administrator II job description (attached as Exhibit J to Defendant's Exhibits Submitted in Support of Motion for Summary Judgment).

Wood testified during a pretrial deposition that his job included the following distinguishing features: it is the second-highest position in the Network Administrator hierarchy; it involves maintaining and operating a computer network system analyzing hardware and software problems, conducting workshops, and configuring work stations. Unlike the next lower position, Wood's position imposes responsibility for independently administering systems, including problem resolution, and generally performing assignments with a higher consequence of error. He declared that he maintains, troubleshoots and repairs personal computers and the computer network at the defendant's 911 Center, which, he said, involves analyzing and taking corrective action on computer and data communications, and hardware and software network problems. In addition, he stated that he occasionally shows users how to operate the computers. He also said that he troubleshoots network connections and tests computer hardware and software. He also maintains the computer-aided dispatch ("CAD") system at the 911 Center and at 103 remote locations. He testified that the CAD system is a very specialized database and that he troubleshoots that system to insure it is running properly and he fixes anything that is wrong with it. In addition, he testified that he has performed what he terms as "rudimentary data extraction" from files for different agencies.

At his pretrial deposition, Wood was asked about the various duties involved in the job description of his current position, Network Administrator II. When asked to describe what was meant by, "analyzes and takes corrective action of computers and data communications hardware and

software network problems," Wood testified,

As problems arise, be it either on a PC or on the network, it is to figure out what is going wrong and either fix it myself or contact whoever can fix it. . . . The most common complaint we [have] here is CAD down. Now there's a wide range of things that can happen for CAD to go down. It can be their communication line going from their computer to CAD isn't working. It could be their computer isn't working at all. It could be that the CAD system is down and a number of other minor things in between, but it's just a matter of just getting them to be a lot more specific with what the problem is. . . . If the communication line is down can I just type the command to bring it up. If the PC isn't working at all or the PC isn't working is there power getting to it. Is it just that the screen isn't working and needs a new monitor. If the computer comes up, then they sign on okay. So depending on exactly what the problem is there's a different routes [sic.] each time.

Wood dep. at 30–31. Wood also testified about how he went about resolving problems when there was more than one way to solve them:

Usually the more common first. For example, if the computer isn't getting power or the computer won't boot up, it could be there's not power getting to the computer or it could be that the power supply is dead. The more common is that it's not plugged in or the cord needs to be jiggled. Once that doesn't work, well let's try a different plug, try another computer in there. If that works okay, the power supply is dead. It's a process of elimination. . . . Generally, if there's nothing we can directly do about it we have to contact the outside vendor for it. For the CAD system or for the PC's [sic.] we have to replace the PC

and contact the outside service provider for repair.

Wood dep. at 32. Wood described another type of typical computer problem,

Most common one is that the PC can't get to one certain application that runs on the server called Hane's Crisscross and a problem usually is that the drive isn't mapped where it's just not seeing the CD ROM. . . . [To fix the problem,] I recreate the connection. . . . I go over to the computer, click on Explorer and re-create the drive mapping. . . . I have to go in and go into a list of all the computers, pick up the server, double-click on it and it brings up a list of all the different folders inside that are able to be accessed. I click on the one for the Hane's program and there's an option I can chose [sic.] called map network drive. By doing that it re-establishes the link.

Wood dep. at 33. Wood testified that another of his job duties requires that he "coordinates and conducts computer workshops for users to provide up to date information and support." Wood dep. at 34. When asked to describe what he did for this particular duty, Wood stated,

What I do is generally it's more a matter of like hey how do you do this. How do you run this command or where can I find this. Just certain information. Like for example we have a database inside the system called the info. file with tons of information like on calls for different town highway departments, mile markers on the expressway, pointing them in the right direction. Go into the info. file into this section.

Wood dep. at 34–35. He indicated that this was informal one-on-one training and did not take place in a classroom. When asked about the job duty of, "demonstrates and trains users in the operation and maintenance of computer hardware and

software," he replied that this also was any informal, one-on-one training.

Wood explained another duty, "monitors the security and efficiency of computer systems and takes corrective action when necessary." Wood dep. at 35. He testified this meant that,

> When new users come into the building into the network to create them and give them access to only what they need. For the most part it's their email and making sure the nothing gets changed or if someone needs access to another area that they have the proper permission to be there. On the efficiency it's to make sure everything is running and responses are getting received within an appropriate amount of time.... The efficiency issue would be for example dispatcher is trying to look at a call coming in, the telecommunicator just put in and it's taking 20 seconds to call it up onto the screen when it should be instantaneous or that someone is trying to read their email and it's taking five minutes to download all the new messages.

Wood aff. at 36–37. Wood further stated, since all computers are leased, when a computer was not working at all, he would be required to contact the leasing agency for service. Moreover, he testified that to correct the problem of a 911 call taking too long to show up on the screen,

> I'm going to ask them how long it's been going on, if anyone else's having the same problem. And I'm going to go to the system console and try and run some commands from there looking at how many processes are running. How long the system has been up and a number of other things, and if it's still going on at this point which is at about two or three minutes I'm going to get on the phone and contact the vendor.

Wood dep. at 38. He also testified that the CAD program and mainframe comput-

er on which it runs are maintained by the vendor that owns the program.

Wood's fifth job duty reads, "configures department workstations and network." When asked what that meant, Wood testified,

> For example with Y2K we replaced everyone of the computers and monitors in our building which was approximately 75 computers and 110 monitors and I unboxed every single PC and every single monitor. Set up every single PC to connect to the networking to the programs on it that was [sic.] needed.... To configure is to set up—to put the appropriate programs in. To put the appropriate addresses in to look for on the network so that when you don't put the wrong one in so if I'm working on a computer on your desk you're not getting into the part of the network that the County Executive is on. Making sure the right programs are on there, whether they need Word or Excel or a specialized program that your department uses.

Wood dep. at 39–40. He also testified that the configuration information was provided to him. Finally, the last job duty reads, "tests new computer hardware and software." In this regard, he stated that,

> If we need to get new equipment, be it a new PC, be it a new mainframe which we just have last week actually, to test everything to make sure it's to the right specifications that we requested and that there's nothing wrong with it.

Wood dep. at 42. In addition, Wood testified that he had written "a number of programs to take and extract data from certain files for different agencies." Wood dep. at 43. He then described the process he went through to determine whether the agency's database had the data the customer wanted, whether a program already existed to extract and present that data,

and if not, how he would write a program to do so. Once he created the program, he did not have to receive approval or authority to run it.

Wood also stated that although two other IS employees work in the 911 Center with him, he has no role in supervising either one of them. He also testified that he spent about 50% of his working time at his desk and the remainder either in the 911 offices, or at any of 104 locations in the county (fire, police and ambulance stations). He further testified that when filling in his pay cards, any time he worked over 40 hours per week, he always requested "premium overtime" pay, meaning time-and-a-half pay. When he was paid time-and-a-half pay, he was required to pay back the extra half time pay.

## C. Michael Burke

Burke currently holds the position entitled "Network Administrator III," which was formerly titled "Senior Network Technician." Some of the distinguishing features of his position are: it is the third level position in the Network Administrator hierarchy; it involves assisting in the installation, configuration, maintenance, and management of the user accounts; it differs from the lower Network Administrator IV position in that it requires responsibility for independent performance of routine duties, and in smaller installations, may require general supervision over a technical staff. Network Administrator III job description (attached as Exhibit L to Defendant's Exhibits Submitted in Support of Motion for Summary Judgment). Burke has been employed by Monroe County for 10 years, having begun as a Network Technician, and having been promoted after five years to System Support Technician, after which he was promoted to Senior Network Technician. His current position has essentially the same job functions as the prior title of Senior Network Technician. He is also responsible for monitoring success or failure of the backup on the local area network system. He spends approximately half of his workday at his desk checking upon the backup equipment, which is done from a computer with software that informs him if the backup performed poorly or well. He then troubleshoots the backup, and refers to manuals and online guides to assist him in this function.

At his pretrial deposition, Burke was asked about his work as a network technician, a title he held prior to the Network Administrator III title. He testified that,

> [i]f [mainframe connected terminal and printer equipment] ceased to function I was the person that was contacted to go out and find out why. There were checklists that we would go through to try to make a determination as to why that stopped functioning.... In most cases, the equipment came with a book that had a list of things that you would go through to determine whether the vendor needed to be called or whether there was something else wrong.

Burke dep. at 23. He also testified that although his initial work concerned terminals and printers connected to the County's mainframe computer, over time mainframe terminals and printers became fewer and personal computers with printers became greater; yet, he also testified that this gradual change in equipment did not change his basic job functions. He stated that in terms of maintaining the equipment, he "[b]asically followed the same guidelines." Id. at 35. In addition, Burke stated that he spent roughly half of his working days at his assigned desk and the remainder away from it at other job locations.

Defense counsel at Burke's pretrial deposition asked him about the job functions listed on the Network Administrator III job description paper. He then asked

Burke to comment on whether the description was accurate with respect to the work Burke actually did in his job. The first descriptive function was, "scheduled installation, replacement, movement and repair of all network communication equipment, in parenthesis terminals, printers, *et cetera*." *Id.* at 55. Burke responded that he did "installation, replacement[,] but I certainly don't schedule it." *Id.* He then described what he did to perform the function of "installation," and stated:

> In most cases today that would entail gathering all of the pieces and parts of whatever it was to be installed. Checking if off on a check list that Patty [Hart, his supervisor] would provide of items that were supposed to be in that particular installation. Either getting this equipment down to the loading dock for myself to transport or calling building and maintenance for assistance in transporting. Transporting the equipment to the site, wherever it's going. . . . Once it's on site, unload it at a loading dock or whatever was available. Find a means to transport it to whatever the location it is that it's going to be installed. . . . Unpack it and basically set it up. . . .
>
> For example, on a server that would be positioning it in a rack or on a table or under a table or whatever the location mandated. In some cases[,] plugging it in and bringing the particular piece of equipment up. Not necessarily on line[,] but so that it's base functions are working. In a lot of cases that would be it. . . .
>
> At times when a supervisor would accompany me[,] we may [*sic.*] go ahead and bring whatever we were installing, bring the installation live. . . .
>
> Putting an actual [*sic.*] on line on a live system affects the entire county system. So when you're going to do that[,] there'[re] a lot of different things that have to come into play. . . . There would

be a whole list of things that would be different. Those would be things I would want to get a supervisor or someone in an administrator position involved in[,] because there'[re] elements of that that I wouldn't have intimate knowledge of in terms of addressing what things should be set as a conflict between devices on a network and interaction between the different servers, naming conventions, things like that. . . . Those are all things that would fall under an administrator position that I wouldn't be doing.

Burke dep. at 56–58. When asked to describe the difference between setting up a piece of equipment and replacing equipment, Burke testified:

> If it was a situation where the monitor went bad on the server your basic check list would be plug it in, see if it works. If it doesn't, replace it. If it has no affect [*sic.*] on the rest of the server or on the network[,] it certainly would be something that you could more or less do yourself without any interaction with the rest of the network or other individuals. . . .
>
> Replacing[,] for example[,] a tape driver that would be part of a server [is an example of something that would be more complex]. That might require you to take the server down. It would affect the rest of the network and users on the network.

*Id.* at 61.

Defendant's counsel then asked Burke to describe what was involved in the job function of movement, and he responded that his best guess was that it was a reference to moving equipment from one place to another. The next descriptive function was, "customizes, maintains and documents all microcodes for network controllers." *Id.* at 63. Burke responded that he had been involved in checking mi-

crocode levels for servers, and that a microcode was,

> firmware that would be interchangeable on equipment. . . . If I know a microcode needs to be updated[,] my supervisor would instruct me to update a microcode on a server. I would follow the procedure to accomplish that. . . .
>
> In general that would be most of the time an after hours activity. The server would be brought down. The CD ROM containing the microcode updates would be brought up. There's a procedure for loading the new versions at which point the server is rebooted and brought back up and basic tests are run on it to ensure that everything went well.

Burke dep. at 63–64. He also stated that he did not customize microcodes. *Id.* at 64.

Although the next function in his job description was, "maintains an on line record of all network hardware at every location," *id.* at 65, Burke testified that he did not do so. He also stated that he did not "evaluate[ ] physical environment for installation of computerized equipment," contrary to the next function in the Network Administrator III job description. *Id.* Finally, he was asked if he was "responsible for everyday operation of personal computer, LANS, local area networks, and mainframe connectivity," *id.* at 65, and he responded,

> I wouldn't say I'm responsible for everyday operation of them, no. . . . In my position for the last year[,] I've been responsible for monitoring success or failure of the backup on the LANS.

Burke dep. at 65. Burke also testified that when at his desk, he primarily checked on the backup equipment. To do this, he stated that,

> [t]here's a function on the computer where I can communicate with local and remote servers and pull back statistics on the [backup] job[—][t]he backup job

completed or did not complete successfully. If it's completed successfully[,] did it run well[,] or did it run poorly. . . . The software tells you that.

Burke dep. at 66.

He also testified about troubleshooting and the process he employed for that function:

> In my job[,] [troubleshooting] would entail going through various check lists that we have for determining success or failure of a given operation or piece of equipment. . . . Some [checklists] are [in manuals]. Some are on line. . . .
>
> The checklists primarily are set up almost in a flow chart fashion where it guides you through whatever troubleshooting you're doing.

Burke dep. at 67–68. He was asked if he reached points in troubleshooting where he was given an option to proceed one way or another and responded, "I don't know whether I would call them options. You're told to take a direction, yes or no. Did the light come on, yes. Follow that branch." *Id.* at 68.

When asked what functions he performed when configuring a piece of equipment, Burke responded,

> If a piece of equipment came in to be set up, I would have some document that would tell me how it was supposed to be set up and what functions it was supposed to have and part of doing configuration would be to set it up that way. . . .
>
> I wouldn't make choices. I would follow the directions I was given to set it up in the fashion it was supposed to set up.

*Id.* at 69–70.

Burke also testified that his job involved manual labor in moving servers, transporting them and other equipment, picking up older equipment and transporting it back. He quantified this activity as taking up a "significant portion" of his time. *Id.* at 71.

## D. Classification of the positions; Terry Vittore

At her deposition, the individual responsible for classifying plaintiffs' positions, Terry Vittore ("Vittore"), reviewed an October 7, 1997 list produced in her office designating titles that were exempt under the FLSA. With regard to the position entitled Assistant Network Administrator, she testified that she classified it as exempt under the FLSA "professional" exemption category. *Id.* at 12–13. However, upon re-reviewing the job description for that position, while at the deposition, particularly the educational requirements, Ms. Vittore agreed with plaintiffs' counsel that the position was not exempt under the professional category. She further testified that upon reviewing the position for the title change in 2001, described above, she, "felt they fit better under the administration exemption but the duties were substantially the same." *Id.* at 15–16. Vittore was then asked to review the classification of Network Administrator. *Id.* at 18. As with the previous position, she agreed with plaintiffs' counsel that it did not qualify for the professional exemption. *Id.* at 20. She also testified there was no system in place for the County to periodically review job positions to determine whether they had been properly classified as exempt or non-exempt under the FLSA. *Id.* at 20. In approximately December 2001, Ms. Vittore determined that the positions of Network Administrator I, II, and III, were all "administratively" exempt from the FLSA. *Id.* at 21.

## E. Defendant's description of the job duties

### 1. Jeffrey Carlton

Jeffrey Carlton ("Carlton"), Manager of Technical Services for the County of Monroe, Information Services Department, testified concerning the procedures used to configure and implement a network server. He testified that when the server is received from the vendor, it has to be configured with a network operating system, Novell. Further, when installing Novell, the operator must choose certain parameters, for example, the length of a password, the number of attempts a user will have to type the correct password, and features and functions that a particular user may access. Carlton stated that the Information Services Department had standards for servers, which were created by its staff. Thus, to configure the server, one would generally introduce various parameters already established by the department's standards. After the server is configured, it is implemented. To implement a server, an Information Services Department employee would arrange with the customer for downtime and introduce the server to the network during the downtime. Carlton specifically testified that Moyer did not have the authority to take down a server during working hours without prior authorization.

Further, Carlton testified that Information Services Department employees only performed software maintenance, and that hardware maintenance was performed by their hardware vendor, IBM. He indicated that in addition to troubleshooting software problems, plaintiffs also performed maintenance, which involved installing updated versions of the software either to correct a known problem, improve performance, or avoid known problems with the current version of the software. He testified that from time to time, both Burke and Moyer would actually put a server together from its separate parts. Moreover, Carlton estimated that in the previous year, Burke's duties included approximately ten percent of his time spent performing manual labor, and that in the past few years, Moyer had spent approximately six hours out of every 40 performing manual labor. As to

Burke, Carlton indicated that Burke's job involved travel to the locations of the various servers in order to do troubleshooting. In addition, Carlton testified that, "Mike Burke doesn't necessarily make independent judgments. If he did, they would be on minor issues, not major issues." Carlton dep. at 33. He indicated that Moyer, on the other hand, "would make independent judgments on major server issues." *Id.* at 33. He stated that Moyer, for example, might make a decision on replacing a troublesome server; however, if the problem is of a "critical nature," he would defer to one of his supervisors. Critical nature, Carlton described, would involve a critical server, for example, a police department server that has to be up and running 24 hours a day.

### 2. *David Whirley*

David Whirley ("Whirley"), Customer Services Manager for the Information Services Department, County of Monroe, is Wood's manager. At his deposition, he testified that prior to the hiring of a 911 technical supervisor in 2001, Whirley was Wood's direct supervisor. He testified that Wood's primary role was to install, support and maintain the administrative network at the County's 911 Center, which included file servers and desktop computers. In addition, Whirley testified that Wood supported the network connectivity between mobile data terminal servers, the CAD system server and its workstations. He explained that one of Wood's duties was to load software which consisted of obtaining software from a vendor and introducing it into the hardware, and that after the initial loading, he monitored to ensure the equipment was running properly, the individual customers gained access to their files, and that response time was appropriate. With regard to connectivity, Whirley described that, "[i]f you have a workstation it's connected to a card within

the workstation which is connected to a cable which is connected to a switch router or hub which is then connected to the file server." Whirley dep. at 13. Whirley testified that Wood was responsible for investigating and determining which part of that system was causing a problem, and that a portion of his troubleshooting duties might also involve swapping out the malfunctioning piece of hardware to resolve whether there was a hardware failure, and if so, contacting the hardware vendor to repair the broken hardware. Since hardware for the CAD system was located at 103 different places around the County, Whirley indicated that part of Wood's job was to travel to those locations to check on the systems. Whirley described the process of troubleshooting as, "when you're investigating or doing any kind of monitoring you're using your judgments, the best of your knowledge, and in cases where you need additional, you know you need additional knowledge, then you escalate." *Id.* at 16. In addition, Whirley testified that approximately less than ten percent of Wood's job involved physical or manual work.

### DISCUSSION

#### A. *The Fair Labor Standards Act*

Section 7 of the FLSA, 29 U.S.Code § 207, requires an employer to pay any employee who works over 40 hours in a week at a rate one-and-one-half times the normal wage rate for any hours over the initial 40. FLSA section 13, 29 U.S.Code § 213, creates exemptions to that requirement and reads in pertinent part:

(a) Minimum wage and maximum hour requirements

The provisions of ... section 207 of this title shall not apply with respect to—

(1) any employee employed in a bona fide executive, administrative, or professional capacity....

29 U.S.Code § 213(a)(1). Congress enacted the FLSA as a remedial act. Thus, its exemptions must be narrowly construed. *See Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 614 (2d Cir.1991). An employer bears the burden of proving that its employees fall within an exempted category of the Act. *Id.*

The Secretary of Labor ("Secretary") has promulgated regulations interpreting § 213's exemptions. The regulations promulgated by the Secretary under the FLSA, pursuant to an express grant of authority from Congress, have *the force and effect of law.* They are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute. *Freeman v. National Broadcasting Co.,* 80 F.3d 78, 82 (2d Cir. 1996) (citations omitted); *Reich v. State of New York,* 3 F.3d 581, 587 (2d Cir.1993). In contrast to the legislative regulations, the Secretary's interpretive regulations are not binding and do not have the force and effect of law. *Freeman v. National Broadcasting,* 80 F.3d at 83; *Reich v. New York,* 3 F.3d at 587. The weight they are to be accorded depends on their persuasiveness. *Reich v. New York,* 3 F.3d at 587–88. Generally, however, they are entitled to considerable weight because they constitute a body of experience and informed judgment to which courts may properly resort for guidance. *Reich v. New York,* 3 F.3d at 588; *Reich v. American International Adjustment Co.,* 902 F.Supp. 321, 324 (D.Conn.1994).

One of the Secretary's regulations sets forth a "short test" to determine an employee's exempt status. In relevant part, that rule applies to any employee whose weekly wage exceeds $250[2] per week and requires that the employee's primary duty be office or non-manual work, directly related to management policies or general business operations, involving the exercise of discretion and independent judgment. 29 C.F.R. § 541.2(e)(2). Each of the plaintiffs in the present case has earned more than $250 per week for the period encompassed by the lawsuit. The primary dispute revolves around whether their jobs involved "discretion and independent judgment." The Secretary's regulation interprets "discretion and independent judgment," at 29 C.F.R. § 541.207(c)(7), and states, in pertinent part:

(a) In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term ... implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

29 C.F.R. § 541.207(a). The regulation also addresses the distinction between exercising "discretion and independent judgment" and the "use of skill" in various respects, and states in pertinent part:

(c)(1) Perhaps the most frequent cause of misapplication of the term "discretion and independent judgment" is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite

---

2. The "long test" applies to employees earning more than $155 per week, but less than $250. 29 C.F.R. § 541.2.

grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

\*    \*    \*    \*    \*    \*

(c)(7) In the data processing field a systems analyst is exercising discretion and independent judgment when he develops methods to process, for example, accounting, inventory, sales, and other business information by using electronic computers. He also exercises discretion and independent judgment when he determines the exact nature of the data processing problem, and structures the problem in a logical manner so that a system to solve the problem and obtain the desired results can be developed. Whether a computer programmer is exercising discretion and independent judgment depends on the facts in each particular case. Every problem processed in a computer first must be carefully analyzed so that exact and logical steps for its solution can be worked out. When this preliminary work is done by a computer programmer he is exercising discretion and independent judgment. A computer programmer would also be using discretion and independent judgment when he determines exactly what information must be used to prepare the necessary documents and by ascertaining the exact form in which the information is to be presented. Examples of work not requiring the level of discretion and judgment contemplated by the regulations are highly technical and mechanical operations such as the preparation of a flow chart or diagram showing the order in which the computer must perform each operation, the preparation of instructions to the console operator who runs the computer or the actual running of the computer by the programmer, and the debugging of a program. It is clear that the duties of data processing employees such as tape librarians, keypunch operators, computer operators, junior programmers and programmer trainees are so closely supervised as to preclude the use of the required discretion and independent judgment.

29 C.F.R. § 541.207(c)(1) and (c)(7).

Other distinguishing features of "discretion and independent judgment" are that the decisions made by the exempt employee must be "significant," need not be final, must be distinguished from loss through neglect, and must require the exercise of discretion and independent judgment customarily and regularly. 29 C.F.R. § 541.207(d)(1), (d)(2), (e)(1), (f) and (g). With regard to those factors, the Secretary's regulation states in pertinent part:

(d) Decisions in significant matters. (1) The second type of situation in which some difficulty with this phrase has been experienced relates to the level or importance of the matters with respect to which the employee may make decisions. In one sense almost every employee is required to use some discretion and independent judgment. Thus, it is frequently left to a truckdriver to decide which route to follow in going from one place to another; the shipping clerk is normally permitted to decide the method of packing and the mode of shipment of small orders; and the bookkeeper may usually decide whether he will post first to one ledger rather than another. Yet it is obvious that these decisions do not constitute the exercise of discretion and independent judgment of the level contemplated by the regulations in subpart A of this part. The divisions have consistently taken the position that deci-

sions of this nature concerning relatively unimportant matters are not those intended by the regulations in subpart A of this part, but that the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence. This interpretation has also been followed by courts in decisions involving the application of the regulations in this part, to particular cases.

\* \* \* \* \* \*

(d)(2) ... the term "discretion and independent" judgment ... does not apply to the kinds of decisions normally made by clerical and similar types of employees.

\* \* \* \* \* \*

(e)(1) ... The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.

\* \* \* \* \* \*

(f) Distinguished from loss through neglect: A distinction must also be made between the exercise of discretion and independent judgment with respect to matters of consequence and the cases where serious consequences may result from the negligence of an employee, the failure to follow instruction or procedures, the improper application of skills, or the choice of the wrong techniques. The operator of a very intricate piece of machinery, for example, may cause complete stoppage of production or a breakdown of his very expensive machine merely by pressing the wrong button.

\* \* \* \* \* \*

(g) Customarily and regularly: the work of the exempt administrative employee must require the exercise of discretion and independent judgment customarily and regularly. The phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which, of course, may be less than constant. The requirement will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretion and independent judgment in the day-to-day performance of his duties.

29 C.F.R. § 541.207(d)(1), (d)(2), (e)(1), (f) and (g).

When determining the categorization of an employee's job as either exempt, or nonexempt, the Court cannot rely on title alone. 29 C.F.R. § 541.201(b); *Cooke v. General Dynamics Corp.*, 993 F.Supp. 56, 60 (D.Conn.1997). Moreover, contrary to plaintiffs' contention that the Court cannot rely on written job descriptions and duties, the regulation and case law support this method of determining whether a particular job should be exempt or nonexempt. *Id.*

### B. Analysis

█ Any inquiry into exempt status is necessarily fact intensive. The exemptions from overtime pay requirements are to be narrowly construed, *Martin v. Malcolm Pirnie*, 949 F.2d at 614, and the employer bears the burden of demonstrating that an employee fits plainly and unmistakably within the exemption's terms. *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); *Reich v. New York*, 3 F.3d at 586–87. Viewing the evidence in the light most favorable to plaintiffs, the Court is not convinced that defendant has shown its entitlement to judgment as a matter of law.

Defendant relies on in part on *Shaw v. Prentice Hall*, 977 F.Supp. 909, 915 (S.D.Ind.1997) in support of its argument that all three positions at issue are exempt. However, the Court finds that *Shaw* is distinguishable from the case at bar.

There, the district court found that a production editor at a publishing company fit within the administrative exemption to the FLSA. In finding that Shaw was an exempt employee, the district court held that she exercised discretion and independent judgement:

> For instance, Shaw exercised discretion and independent judgment in making editorial choices to improve the clarity and user-friendliness of the text and the index, approving or disapproving proofreaders' and copy editors' edits, making decisions regarding how to best manage the process in order to meet deadlines set by her managing editor, making suggestions to her managing editor regarding re-prioritizing or changing those ultimate deadlines, and providing input into the selection of freelance copy editors and technical editors. These decisions were made independently and related to matters of great importance to Macmillan, as the success of Macmillan's business depends largely on meeting production deadlines and producing books that are easily understood by readers.

*Id.* While it cannot be disputed that the operation of defendant's computers and computer networks were of substantial importance to the management or operation of defendant's business, the Court disagrees with its characterization of plaintiffs' work as involving discretion and independent judgment, since plaintiffs in the case at bar made no independent decisions on matters of great importance to the County's business. Though any one of these three employees could easily disrupt County operations almost literally by "merely by pressing the wrong button," 29 C.F.R. § 541.207(f), they were not, "normally and recurrently ... called upon to exercise and [did] exercise discretion and independent judgment in the day-to-day performance of [their] duties," 29 C.F.R. § 541.207(g). They did not decide what software was loaded, or whether to update

the software on a particular system. They performed highly-skilled work when troubleshooting problems, but this is not evidence of discretion and independent judgment. *See* 29 C.F.R. § 541.207(c)(1). The evidence before the Court shows that the majority of their work involved routine duties without the requirement of discretion and independent judgment called for in an exempt position under the FLSA.

The Southern District's decision in *Massaro v. New York Times, Inc.,* 1988 U.S. Dist. LEXIS 5257, 28 Wage & Hour Cas. (BNA) 1449, 1988 WL 59637 (S.D.N.Y., No. 87 Civ. 0957, June 6, 1988) is instructive. There, the plaintiff, in describing his own job, stated, " '[m]y duties were basically to develop a computer system for the advertising department. I was a liaison between the sales staff and the computer systems area.' " *Massaro,* 1988 U.S. Dist. LEXIS 5257, *12, 1988 WL 59637, at *5 (quoting plaintiff's deposition). The court held the plaintiff was an exempt employee under the "administrative" exemption, since,

> [the plaintiff's] primary duties involved the performance of nonmanual work directly related to the general business operations of The Times. Plaintiff was a member of a team specifically recruited by The Times to design, develop and implement an advanced computerized information system, which supported the activities of the Times Advertising Department in making vital decisions regarding advertising sales efforts and promotions. A newspaper certainly cannot operate without paid advertisements, and the plaintiff's work contributed directly toward the administrative goal of increasing that revenue.

*Id.* 1988 WL 59637, 1988 U.S. Dist. LEXIS 5257 *10. In contrast, the Court finds that Moyer, Wood and Burke did not exercise independent discretion to the extent

contemplated by the Secretary's regulations. Their functions consisted primarily of following established standards to set-up and maintain computers and networks, following recommended procedures for troubleshooting and essentially performing functions more analogous to key punch operators than programmers. "Exercising discretion and independent judgment" implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance. 29 C.F.R. § 541.207(a).

After reviewing the evidentiary proof in admissible form, the Court concludes that defendant has failed to carry its burden of showing entitlement to judgment as a matter of law. With respect to Moyer[3], the Court concludes that his job duties as a Network Administrator I primarily consisted of operating computers to install and configure the Novell and operating system software, and occasionally making recommendations for the purchase of new software. With regard to Wood, his position involved much the same as Moyer's, however, none of his work appears to involve the exercise of discretion and independent judgment. The only arguable portion of his work that does involve more than rote application of already-established procedures is the process of troubleshooting problems. Nevertheless, as he pointed out, that process involved primarily using established steps to try and eliminate various possibilities and eventually coming to a conclusion about the cause of a problem. Much of his troubleshooting duties required the *operation* of computers, and the rest involved manual labor checking connections. Finally, it is clear that Burke does not fit the Secretary's regulations interpreting the statutory exemptions.

Even his supervisor testified that, "Mike Burke doesn't necessarily make independent judgments. If he did, they would be on minor issues, not major issues." It should be noted that, during oral argument, defense counsel conceded that if the Court found against defendant with respect to Moyer, it must necessarily find against defendant with respect to the remaining two defendants.

Thus, the Court concludes that defendant has not shown its entitlement to judgment as a matter of law on the facts presented.

## CONCLUSION

In view of the foregoing, defendant's motion (docket # 12) for summary judgment is denied.

---

**3.** It should be noted that, during oral argument, defense counsel conceded that if the Court found against defendant with respect to Moyer, it must necessarily find against defendant with respect to the remaining two plaintiffs.